TSE, Ho Keung ;

P.O.Box 80306,

Cheung Sha Wan Post Office,

Hong Kong.

tse2012@sina.com

608.268.3667

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| HO KEUNG TSE,<br><br>    Plaintiff Pro Se,<br><br>vs.<br><br>GOOGLE, INC. ET AL.,<br><br>    Defendants.<br><br>TSE, HO KEUNG,<br><br>    Plaintiff Pro Se,<br><br>vs.<br><br>BLOCKBUSTER L.L.C.<br><br>    Defendant. | Case No. C 3:13-cv-00194 SI and<br>3:13-cv-01204-SI<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF INVALIDITY BASED ON LACK OF WRITTEN DESCRIPTION UNDER 35 U.S.C. § 112**<br><br>Hearing<br>Date :    August 30, 2013<br>Time:    9:00 a.m<br>Courtroom: 10, 19th Floor<br>Judge:    Hon. Susan Illston |

PLAINTIFF'S OPPOSITION TO MSJ OF INVALIDITY RE: WRITTEN DESCRIPTION
C 3:13-cv-00194 SI and 3:13-cv-01204-SI

**A. Defendants Failed to Meet its Burden to Challenge Valid '797 Patent**

As in fact there is no Patent Office's decision that the '797 patent itself fails any written description requirements, Defendants' Motion on its face, is unable to meet its heavy legal burden of persuasion[1] to challenge the presumed valid '797 patent—Defendants' conclusory statements or a mere reference to the functional description of EI program which is for making payment, is definitely not enough, even though it is quoted from the BPAI's Decision on Appeal.

**B. *Santarus, Inc.***

In Defendants' "Motion for summary judgment of invalidity based on lack of written description under 35 U.S.C. § 112" ("Motion"), P.9, Defendants' misread *Santarus, Inc. v. Par Pharm., Inc.*, 694 F.3d 1344 (Fed. Cir. 2012), by quoting "Negative claim limitations are adequately supported when the specification describes a reason to exclude the relevant limitation.", but omitting the statement immediately following, "Such written description support need not rise to the level of disclaimer. In fact, *it is possible for the patentee to **support** both the inclusion and exclusion of the same material*." (emphasis added)

Before "a reason to exclude", *Santarus, Inc.* articulated that, "This exclusion narrowed the claims, as the patentee is entitled to do. The Manual of Patent Examining Procedure explains that ***claims may state the exclusion of alternatives***. *See* MPEP § 2173.05(i) ("If ***alternative elements*** are ***positively recited*** in the specification, they may be explicitly excluded in the claims."). For example, in *In re Johnson*, 558 F.2d 1008, 1019 (CCPA 1977), the applicant narrowed the claims to exclude the content of a lost interference count, and the court observed that: "It is for the inventor to decide what bounds of protection he will seek." (emphasis added) *id*.

---

[1] A party seeking to invalidate a patent must overcome a presumption that the patent is valid. 35 U.S.C. § 282; the presumption of a patent's validity must be overcome by clear and convincing evidence. See *Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1355 (Fed. Cir. 2007); *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir.2003)

As such, *Santarus, Inc.* did not mandate "a reason to exclude", instead, *Santarus, Inc.* merely uses it as a remedy when a positive recitation is absent.

**C. BPAI's decision on Parent Application '448 priority is NARROW**

In the Decision of Appeal (Exh. F to the Motion, Dkt. 98-1), P.19, footnote 11 :

"Appellant' s Appeal Brief makes additional arguments regarding their claim to priority based upon the '448 parent application, but *these arguments do not address independent claims 14 and 24*, instead those arguments are specifically related to Appellant's independent claims 1, 11, 18, 23, and 26. (App. Br. 65-86.) Nevertheless, our decision takes these arguments into account to the extent they are applicable to the specific limitations of independent claims 14 and 24. (See App. Br. 65-76.)" (emphasis added)

As such, BPAI's decision of a lack of written description support in the parent application, is merely directed to limitations "being used in enabling electronic commerce operation(s) ... " and "access to said software desired to be protected is being provided without causing a said operation being performed ... " as generally recited by independent claims 14 and 24 (see Decision on Request for Rehearing, Exh G to Motion, P.2, "STATEMENT OF THE CASE"), apparently for the reason that "*these arguments do not address independent claims 14 and 24*".

Other claims with different versions of "No Charging" limitations[2] , should not be affected. However, in their Motion, Defendants extend the BPAI's decision to broadly cover all the different versions of "No Charging" limitations of all claims.

Claims 14, 24[3] were cancelled in the subsequently issued Reexamination Certificate.

Further, in the Decision on Appeal, the BPAI did not disturb the decision of Final Office Action (Exh D) that independent claim 16 is patentable, at P.17, last paragraph-P.18 first

---

[2] All different versions of "No Charging" limitations in the claims are highlighted in Exh.A, '797 patent, col.7, line 4 –Col. 10 and second, third to last page, "Reexamination Certificate".

[3] Note that the cancelled claim 24 was replaced by the examiner with another allowable claim.

1  paragraph, "Claim 16, as amended by the Patent Holder, is *fully supported by the Application No.

2  08/587,448*, …. Munyan, does not have a filing date[4] that predates the '448 application, Munyan

3  can no longer be used as a prior art reference under 35 U.S.C. 102(e)." (emphasis added)

4      Claim 16 itself has a "No Charging" limitation: "said method is being performed without

5  causing a said transaction take place", differs from that of the canceled claims 14,24.

6      As to the reasoning for the decision, it should carry no weight, as it merely touched on the

7  functional description of EI program which is for making payment, with not even a single word

8  directed to Plaintiff's arguments in Appeal Brief (not submitted herewith as exhibit, as some

9  arguments therein will be submitted herein below) which is basing on the first, second and third

10  embodiments; much less the three embodiments themselves. The following is a real image of

11  Decision on Appeal, P20- P.21):

13  > We are not persuaded by Appellant's arguments and agree with the
14  > Examiner that "since the only functionality with respect to electronic
15  > commerce is disclosed with respect to the EI program [] rather than the ES
16  > [program], claims 14 and 24 are not supported by the disclosure of the '448
17  > application." (Ans. 13.) Specifically, we find that the '448 parent
18  > application describes that "the central program causes the EI program to
   > execute for providing an encrypted identity of the user" (FF P1) and "the
19  > central computer may use the encryption result, if it being correct, from the
20  > EI program as a user authori[z]ation for payment to be made, from a user
21  > account for obtaining network services or software products or the like" (FF
   > P2.) However, we are unable to find any support in the original disclosure
22  > of the '448 application which conveys with reasonable clarity to one skilled
23  > in the art that EI program would *not*, upon a correct encryption result,
24  > authorize a user authorization for payment to be made, thus resulting in
25  > providing access without charge, or "access to said software desired to be

---

[4] Munyan's filing date is December 1, 1995, same as '448 parent application.

protected is being provided without causing a said operation being performed," as presently recited by independent claims 14 and 24.

And, here below is a real image of "FF P1" and "FF P2" which is being referred to in the above passage:

*Parent Application - '448 Parent Application*

P1. The '448 application[10] describes that "the central program causes the EI program to execute for providing an encrypted identity of the user, that encrypted identity will also be send to the central computer. The central computer will permit the access request from the user if the unencrypted and encrypted identities are consistent with each other." (p. 4, ll. 1-4.)

P2. In describing the program for providing Encrypted Identity (EI program), the '448 application states, "the central computer may use the encryption result, if it being correct, from the EI program as a user authori[z]ation for payment to be made, from a user account for obtaining network services or software products or the like." (p. 4, l. 25 – p. 5, l. 2.)

Plaintiff attempted to appeal the BPAI's decision on '448 parent application priority to the Federal Circuit, however, owing to a series of accidents, the appeal was dismissed, for detail, refer to Exh. C, which is a Plaintiff 's letter to the Patent Office, informing it of the same.

**D. Plaintiff's Arguments**

The "written Description" issue is dispositive, as it affects validity of parent application '448 priority[5].

1) One embodiment is Enough for Support of "No Charging" limitations

Referring to the '797 patent, col.1 lines 46-51 ('448 mother application, P.2, lines 5-8), "The **EI subprogram is for** …a secure operation on a user account .. for **payment**" .

---

[5] Defendants raised more than 50 prior art references in their Invalidity Contentions, only a few dates earlier than the parent application '448.

1  The spirit of the present invention is readable on '797 patent, col.1, lines 56-63 (Exh.A,
2  highlighted in YELLOW) :

3  "The **AS sub-program** is for using ….**the existence of the EI sub-program** …as
4  preconditions for authorising those software products …to be used on that computer."

5  And ,'448 parent application, P.2, second paragraph, last 3 lines similarly discloses (Exh.B,
6  highlighted in YELLOW):

7  "The **ES program**[6] is for using the ………**the present of the EI program** as a precondition for
8  enabling those software obtained to run on a computer."

9  It should be noted that, the three embodiments disclosed in the '797 patent (also the parent
10 application 08/587,448), namely as, **the first embodiment, second embodiment and third**
11 **embodiment**, **are closely related** in that all of them require AS sub-program to allow protected
12 software to be accessed, under the "existence of the EI program" precondition.

13 Therefore, if any one of the embodiments discloses "No Charging", one of ordinary skill in
14 the art would know "charging" is not required by the other embodiments.

15

16 2) The third Embodiment- No EI program for authorizing payment

17 The third Embodiment is readable on the '797 Patent, Col.6, lines 8-24 (Exh.A, highlighted
18 in GREEN):

19 "According to the third embodiment, the encryption algorithms *A1 and A2* that the
20 EI and AS sub-programs use respectively for providing an encrypted identity to the
21 central computer and for generating encrypted commands to authorise use of a
22 software product respectively, *is a same algorithm*."

23 "Thus, it would be equivalent for a rightful user to copy his EI sub-program to
24 someone else if he copies his AS sub-program to someone else. In this case, *a slight*
25 *modification* on the AS sub-program can make it equivalent to the EI sub-program

---

[6] Note that in the '448 parent application, the "AS sub-program" of '797 patent, is named as "ES program".

      and which involves adding a simple interface program for receiving a random number from the central computer, feeding the random number into the AS sub-program, receiving the encryption result from the AS sub-program and supplying the encryption result to the central computer, and such functions are commonly found in any network interface software."(emphasis added).

In the third embodiment, the ES program is incapable of making payment can easily be visualized by the fact that, **"the slight modification"** can only be effected by a programmer with human intelligence. Thus, "no charge" is inherent in the third embodiment.

      See *In re Wright*, 866 F.2d 422, 425, 9 USPQ2d 1649, 1651 (Fed. Cir. 1989) (Original specification for method of forming images using photosensitive microcapsules which describes removal of microcapsules from surface and warns that capsules not be disturbed prior to formation of image, unequivocally teaches absence of permanently fixed microcapsules and supports amended language of claims requiring that microcapsules be "not permanently fixed" to underlying surface, and therefore meets description requirement of 35 U.S.C. 112.). See also *In re Nathan*, 328 F.2d at 1008-09, 140 U.S.P.Q. at 604 ("alpha orientation" need not be specifically disclosed in order to have a "written description" since it was an inherent characteristic of product); *Kennecott Corp. v. Kyocera Int'l, Inc*., 835 F.2d 1419, 1423 (Fed. Cir. 1987) (reversing district court's decision that specification did not adequately describe ceramic bodies having a certain, unmentioned property where the ceramic bodies described in the specification inherently possessed that property).

    To create an EI sub-program equivalent but without its payment capability, i.e., the AS sub-program, in the third embodiment, is of course for precluding the necessity of having a real EI sub-program therein.

PLAINTIFF'S OPPOSITION TO MSJ OF INVALIDITY RE: WRITTEN DESCRIPTION
C 3:13-CV-00194 SI and 3:13-cv-01204-SI

6

During the Reexamination, the requesters[7] argued in their "Reply by Third Party Requesters Pursuant to 35 U.S.C. § 304 AND 37 C.F.R. § 1.535" (filed with the Patent Office on Feb 13, 2008, not submitted herewith as Exh), that "Mr. Tse's argument ignores that the third embodiment includes an EI program for charging." But its absurdity can be easily seen by the fact that, if it is true of the third embodiment that it includes the EI program and requires payment to deter piracy, then in order to use an illegitimate software, a user is supposed to pay at least three times, i.e., once when purchasing the software; once when using the illegitimate software with the EI program for payment; and once after the user has himself successfully converted the AS sub-program to EI program for payment.

The third embodiment is similarly disclosed in '448 parent application, P.8, last two paragraph- P.9, first paragraph (Exh.B, highlighted in GREEN):

> According to the third embodiment, the encryption algorithms A1 and A2 that the EI and ES programs use respectively for providing encrypted identity to the central computer and for generating encrypted commands to enable running software respectively, is a same algorithm.
>
> Thus, it would be equivalent for a rightful user to copy his EI program to someone else if he copies his ES program to someone else. In this case, a slight modification on the ES program can make it operate in the same manner as the EI program, which involves adding a simply interface program for receiving a random number from a central computer, feeding the random number into the ES program, receiving the encrytion result from the ES program and supplying the encrytion result to the central computer, and such functions are commonly found in any network interface software.

3)   The Second Embodiment- EI program not being used to authorize payment

---

[7] They are Apple et al. in case Tse v Apple et al., case C 06-06573 SBA.

The second embodiment is readable on the '797 Patent, Col.5, lines 53- Col 6, line 8 (Exh.A, highlighted in BLUE) :

"According to the second embodiment, the AS sub-program[8] is separated from the central program and become an independent program, whereas the central program comprises the EI sub-program only. The AS program is bound to the EI sub-program by requiring the AS program to operate only when the EI sub-program exists in the same computer. Specifically, the AS program when running, can cause the EI sub-program to be executed for generating an encrypted identity for the AS program to authenticate. The EI sub-program knows that this is a request for encrypted identity from the AS program, not a request from user for encrypted identity for accessing the central computer, by the method of input parameter as mentioned above in item 1b."

"Further, the EI sub-program before sending the encrypted identity to the AS program, may first check the data integrity of itself by, for instance, checksum method. Alternatively, it may also be that the AS program performs the checking. And, if the checking result is that some data in the EI sub-program being altered, then in the former case, the AS will be caused to be not operable by the EI sub-program by not sending it an encrypted identity, and in the latter case, the AS program will be caused to be not operable by itself."

Note that in the first paragraph incorporated above, last three lines, "The EI sub-program knows that this is a request for encrypted identity from the AS program, not a request from user for encrypted identity for accessing the central computer, by the method or input parameter", it clearly indicates that the encrypted identity generated by the EI program is supplied to AS program, for informing the ES program the existence of the EI program, thereby causing the AS program to enable use of software products. And, as the encrypted

---

[8] Note that in the '448 parent application, the "AS sub-program" of '797 patent, is named as "ES program".

1  identity is not supplied to the central computer which is the only device disclosed in the '797
2  patent, for effecting payment, therefore the operation of the third embodiment would not result
3  in payment.

4     See *Ex parte Parks*, 30 USPQ2d 1234 (BPAI 1993) (The Board determined that the
5     claimed phrase "in the absence of a catalyst" in a process claim did not violate the
6     written description requirement because it was implicitly clear from the Specification
7     that the reactions were carried out without a catalyst such that no new concept was
8     introduced by the negatively claimed language.); *Schering Corp. v. Geneva Pharms.,*
9     *Inc.*, 339 F.3d 1373, 1379 (Fed. Cir. 2003). Inherent disclosure may exist only if it is
10     "the natural result flowing from" the explicit disclosure.

11
12  The third embodiment is similarly disclosed in the '448 parent application, P.8, second
13  and third paragraphs (Exh.B, highlighted in BLUE):

14  According to the second embodiment, the ES program is separate from the
15  central program which comprises the EI and AC program. The ES program is bound
16  with the EI program by requiring the ES program to operate only when the EI
17  program is present on the same computer. Specifically, the ES program when running,
18  can cause the EI program to be executed for generating an encrypted identity for the
19  ES program to authenticate. The EI program knows that this is a request for encrypted
20  identity from the ES program, not a request from user for encrypted identity for *in item 1*
21  accessing a central computer, by the technique of input parameter as mentioned above.

22  Further, the EI program before sending the encrypted identity to the ES
23  program, may first check the data integrity of itself by, for instance, checksum
24  method. Alternatively, it may also be that the ES program performs the checking. And,
25  *if* the checking result is that some data in the EI program being altered, *then*, in the
26  former case, the ES will be caused to not operable by the EI program by not sending it
27  a encrypted identity, and in the latter case, the ES program will *be* caused to not operable
28  by itself.

4) First Embodiment

The first embodiment is readable on '797 Patent, "DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS", Col. 2, line 30-Col.5, Line 51, not fully covered here.

Also similarly disclosed in the parent application 08/587,448, P.3-P.8, first paragraph..

It should be noted that in the first embodiment, before AC sub-program can be used "for authenticating a computer on which it runs as being a particular predetermined computer, and prevent use of protected software if the computer is not" (Col.4, lines 46-48, Exh. A, highlighted in PINK), an "initialization process" has to be performed, in which, "the central program sends to the central computer, as mentioned herein above in item 2, an unencrypted identity of the rightful user of the central program, then the AC sub-program requests for an encrypted command from the central computer which will provide such an encrypted command, in the manner as described hereinabove in item 3i, *if the rightful user has a valid account which is not closed*." (emphasis added), "After authenticating the command, the AC sub-program determines the hardware and software configuration of the user computer" ('797 Patent, Col. 4, lines 54-65, see Exh. A, highlighted in PINK)

Also similarly disclosed in the parent application 08/587,448, P.6, last two paragraphs, see Exh. B, highlighted in PINK.

In the both '797 patent and '448 application, the central computer is *the only device in the description for effecting payment*. Note that "*a valid account which is not closed*" does not necessarily mean it is capable of making payment, for e.g., the account's fund is exhausted, or has reached its credit limit, is also a valid account which is not closed. Nevertheless, the owner of such an account would still not be willing to share his account info with other people, unless he intends to abandon the account forever. This suggests, if not implicitly disclosing, the first embodiment requires no payment.

No other part of the first embodiment discloses the central program, or the EI program therein, communicating with the central computer which is for effecting payment.

**Conclusion**

As the third embodiment is incapable of making payment, therefore suggesting all other embodiments sharing the same concept of requiring the presence of EI program for deterring piracy, should also be "No Payment" for allowing a rightful user to use his/her software. Further, the description of the second embodiment itself discloses its operation would not result in any payment, even though it has an EI program which is fully capable of making payment. Thus, in the written description of '797 patent and '448 parent application, the "No Charging" limitations[9] are *positively recited. Santarus, Inc.* 1344.

After the above submission, unless the Court instructs Plaintiff to come, Plaintiff will not attend the hearing scheduled to occur on Aug 30, 2013, and will rest on this opposition brief[10].

Signed this 1st day of August, 2013,

/s/ Ho Keung TSE
Ho Keung TSE
P.O. Box 80306
Cheung Sha Wan Post Office
Hong Kong
tse2012@sina.com
608.268.3667

Plaintiff Pro Se

---

[9] They include "being used in enabling electronic commerce operation(s) ... " and "access to said software desired to be protected is being provided without causing a said operation being performed ... " of claim 1, 11, 23 and 25 in the Reexamination Certificate. (second, third to last page, Exh.A)

[10] For discussions of matters outside the Motion, Plaintiff suggests to leave them to the status conference on Sept. 20, 2013. Plaintiff anticipates he would be able to attend in person.

PLAINTIFF'S OPPOSITION TO MSJ OF INVALIDITY RE: WRITTEN DESCRIPTION
C 3:13-CV-00194 SI and 3:13-cv-01204-SI

11